# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 17-cv-2391-WJM-NRN

K.D., by his next friend and parent, Sherise Nipper; and
SHERISE NIPPER as an individual,

      Plaintiffs,

v.

HARRISON SCHOOL DISTRICT TWO,
HARRISON SCHOOL DISTRICT TWO BOARD OF EDUCATION,
ANDRE SPENCER, PhD, in his official and individual capacity,
LORNA BRESKE, in her individual capacity,
SERGIO DELOURENCO, in his individual capacity,
MONICA GLICKMAN, in her individual capacity,
ELIZABETH COLLINS, in her individual capacity,
JOHN DOE, in his official individual capacity, and
DOES 1 through 10, inclusive

      Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION TO DISMISS

---

In this lawsuit, Plaintiff K.D., through his mother, Sherise Nipper, and Sherise

Nipper in her own capacity (together, "Plaintiffs") sue Defendant Harrison School District

Two ("School District"), its board ("School Board"), and various School District

employees. Plaintiffs allege that Defendants took no steps to stop pervasive bullying

against K.D. at school. This bullying, Plaintiffs say, was race-motivated (K.D. is white in

a majority non-white school) and disability-motivated (K.D. has a walking disability).

Plaintiffs therefore allege racial discrimination in violation of Title VI of the Civil Rights

Act of 1964 ("Title VI"), 42 U.S.C. §§ 2000d *et seq.*; racial discrimination in violation of

the Fourteenth Amendment's Equal Protection Clause (asserted by way of 42 U.S.C. § 1983); disability discrimination in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*; and disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

Currently before the Court is a Motion to Dismiss filed by all Defendants save for the specifically named "John Doe" Defendant and the other generic Doe Defendants. (ECF No. 39.)  For purposes of this Order, the Court will refer to the moving Defendants simply as "Defendants."  They seek dismissal of all causes of action asserted against them.  As explained below, the Court will grant the Motion to Dismiss except as against K.D.'s Title VI cause of action.  The stay of discovery will therefore be lifted and the case will go forward against the School District on the Title VI claim, and—at least for now—against John Doe and the other Does on all claims.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits the Court to dismiss for "failure to state a claim upon which relief can be granted."  The Rule 12(b)(6) standard requires the Court to "assume the truth of the [claimant's] well-pleaded factual allegations and view them in the light most favorable to the [claimant]."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint [or counterclaim] contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567

F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint [or counterclaim] may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. FACTS

The following facts, taken from the Second Amended Complaint ("complaint") (ECF No. 36), are deemed to be true for purposes of Defendants' Motion.

## A. Background

K.D. was born in 2005. (*Id.* ¶ 8.) He lives with his mother, Sherise Nipper, and stepfather, Nicholas Nipper, in Colorado Springs. (*Id.* ¶ 7.) Sherise Nipper and K.D. moved to Colorado in 2015 so Sherise could obtain cannabis to treat her epilepsy. (*Id.* ¶¶ 20–21.)

In the 2015–16 school year, K.D. attended Pikes Peak Elementary School ("Elementary School"), within the School District. (*Id.* ¶ 24.) In the 2016–17 school year, K.D. attended Carmel Middle School ("Middle School"), also within the School District. (*Id.*) Only a field separates the Middle School campus from the Elementary School campus. (*Id.*)

About 50% of the School District's students are Hispanic; about 25% are white; and about 15% are black. (*Id.* ¶ 25.) During the time period relevant to this lawsuit, the enrollment at Pikes Peak Elementary School and Carmel Middle School roughly mirrored the racial breakdown of the School District generally—Hispanic students formed the majority, followed by white students and then black students. (*Id.*) K.D. is white. (*Id.* ¶ 26.)

K.D. has a disability known as idiopathic toe walking (habitually walking "on

tiptoes"). (*Id.* ¶¶ 28, 53.) He therefore has a noticeably different walking style and he tends to wear out the toe area of his shoes quickly. (*Id.* ¶ 28.)

**B.    Allegations Against the Various Individual Defendants Before the Stabbing Incident**

The core of Plaintiffs' complaint is the alleged lack of response by Defendants to Hispanic students' persistent bullying of K.D. based on his race; and students' persistent bullying of K.D. based on his disability. Plaintiffs estimate that K.D. was bullied "approximately 75 times." (*Id.* ¶ 68.) This bullying culminated in a school fight where a Hispanic student stabbed K.D. with a highly sharpened pencil—and K.D. has not since returned to the Middle School. Before providing details on the stabbing incident (*see* Part II.C, below), the Court will summarize the specific instances of alleged bullying that led up to it.

In April 2015, a Hispanic student at the Elementary School punched K.D. on the side of his head in the school cafeteria. (*Id.* ¶ 40.) This incident predates the 2015–16 school year, which the complaint otherwise portrays to be the beginning of the relevant time period. (*See id.* ¶ 24.) Plaintiffs provide no explanation for this apparent discrepancy. In any event, a school nurse gave K.D. cursory treatment twice and both times sent him back to class, but the nurse never reported the incident to School District authorities or to K.D.'s parents. (*Id.*) That same day, a Hispanic student told K.D., "Kill yourself." (*Id.* ¶ 41.)

K.D. told his parents about the punch and the taunt when he returned home from school that day. (*Id.*) K.D.'s parents complained to "Defendant Doe school authorities including individuals in Defendant Breske's office about this incident and continued to communicate their concerns to the school on a weekly basis." (*Id.*) Breske, however, is

the Middle School's principal.  (*Id.* ¶ 12.)  It is unclear why K.D.'s parents complained to the Middle School administration, rather than the Elementary School administration. Similarly, K.D.'s parents say they "specifically spoke to Defendants[] Spencer, . . . Delourenco, [and] Glickman" (*id.* ¶ 41), but none of those individuals work at the Elementary School.  Rather, Glickman and Delourenco are both assistant principals at the Middle School.  (*Id.* ¶¶ 13–14).  Spencer is the School District's superintendent.  (*Id.* ¶ 11.)

Although Spencer, as compared to Breske, Delourenco, or Glickman, likely could exercise some authority regarding the Elementary School, the accusations regarding him are confusing.  As noted, Plaintiffs contend that K.D.'s parents "specifically spoke" with Spencer.  However, the very next paragraph of the complaint alleges that they *did not* speak with Spencer because persons at the School District's main office said that all requests for appointments with Spencer must be made through an online system, yet the Nippers did not have a computer to use and their smartphones were useless because the website was not mobile-friendly.  (*Id.* ¶ 42.)  K.D.'s parents faced this obstacle multiple times and "continued to inform [the District's] authorities, administrators and agents that they did not have a computer."  (*Id.* ¶ 43.)

Making no headway, Sherise Nipper used her smartphone to start a change.org petition directed at Spencer to "stop the bullying at [P]ikes [P]eak [E]lementary."  (*Id.* ¶ 44.)  "According to the petition posting on the website, the petition was to be delivered to [Spencer]."  (*Id.* ¶ 45.)  Plaintiffs do not allege that the petition was actually delivered to Spencer or anyone else.

On another occasion (date unspecified), K.D. rode his bike to school (whether

Elementary School or Middle School, likewise unspecified) but bullies tried to grab him as he rode, so he turned around and went home.  (*Id.* ¶ 46.)  K.D.'s parents "called the police who went to the school and spoke to [District] authorities and Defendant Doe(s)." (*Id.*)  "No action was taken . . . to the Nippers' knowledge."  (*Id.*)

Another incident of bullying took place in the fall of 2016 at the Middle School. (*Id.* ¶ 47.)  In this incident, "students were spitting on K.D."  (*Id.*)  Sherise Nipper reported the incident to Principal Breske, "who merely said 'boys will be boys.'"  (*Id.*)

Also in the fall of 2016, a group of Hispanic students at the Middle School prevented K.D. from taking his bike to the bike rack.  (*Id.* ¶ 48.)  K.D.'s parents "called the school and informed a District employee of this incident" and requested "an adult monitor [at] the bike rack," but nothing came of the request.  (*Id.*)

Again in the fall of 2016, "students made fun of K.D. inside the gym locker room because K.D. was 'so white.'"  (*Id.* ¶ 49.)  K.D. told his parents about this incident who then reported it to "authorities" at the Middle School.  (*Id.*)

Sometime during September 2016, another student kicked K.D. in the head during music class.  (*Id.* ¶ 51.)  The teacher verbally reprimanded the student, but took no other action.  (*Id.*)

In late September 2016, K.D.'s toe-walking disability prompted an argument between him and "other children" at the Middle School.  (*Id.* ¶ 52.)  K.D. told his parents about the incident who then reported it to "District authorities," to no effect.  (*Id.*)

Around the same time, K.D. was fitted with special casts and orthotics to treat his toe-walking.  (*Id.* ¶¶ 53–54.)  One of the persons who signed K.D.'s cast was a family friend and owner of the marijuana dispensary where Sherise Nipper obtains cannabis.

(*Id.* ¶ 54.)  The dispensary is named Weed Pimp Nation, and the owner signed the cast "WP4L," meaning "Weed Pimp for Life."  (*Id.* ¶¶ 22, 54.)  Soon after, however, Defendant John Doe (K.D.'s gym teacher at the time), noticed the "WP4L" inscription and asked K.D., "in front of other students, why he had something representing 'white power' on his cast."  (*Id.* ¶ 54.)  Later the same day, K.D.'s locker was vandalized and some of his personal items were damaged.  (*Id.* ¶ 57.)

K.D. did not know what "white power" meant so he described the gym incident to his parents.  (*Id.* ¶ 55.)  They, in turn, feared racially motivated retaliation against K.D. and reported the incident to a person "believed to be" Assistant Principal Glickman. (*Id.*)  Glickman "responded that this was a misunderstanding on the part of the gym teacher," and did nothing.  (*Id.*)  K.D.'s parents also reported the locker vandalization, but this report went only to unnamed "Defendant school authorities."  (*Id.* ¶ 57.)

The following day, a group of Hispanic students from another school joined a group of Hispanic students from the Middle School and waited at the bike rack for K.D.'s arrival, intent on bullying him.  (*Id.* ¶ 58.)  When K.D. saw this group, he turned his bike around and rode home.  (*Id.*)  K.D.'s parents returned to the school and spoke with to "school authorities" and a "coach," whose names they do not know.  (*Id.* ¶ 59.)  One of them said that they knew about the incident and that a video existed, but the video could not be shared due to privacy laws.  (*Id.*)  From this point forward, one of K.D.'s parents always accompanied him to school.  (*Id.* ¶ 60.)

K.D.'s parents then returned to meet with a person "who they believe was" Assistant Principal Glickman.  (*Id.* ¶ 61.)  Glickman "believed the harassment was racially motivated" but "also accused K.D. of engaging in racially motivated verbal

harassment against other students." (*Id.*) Glickman did not take action to prevent any bullying. (*Id.*)

Still around the same time, Nicholas Nipper was walking K.D. to school and observed Hispanic children bullying a child with Down syndrome on the field between the Middle School and Elementary School. (*Id.* ¶ 62.) Nicholas Nipper intervened and one of the students, "I.P.," told him, "I'm going to jump your kid." (*Id.*) Nicholas Nipper "went straight to [the Middle School] and reported [this to] the School District authorities." (*Id.*) School officials monitored the field for the next two days, but not afterward. (*Id.* ¶ 63.)

Yet again around the same time (late September 2016), a friend of K.D.'s came to his house and told K.D.'s parents that he feared for K.D.'s safety at the Middle School. (*Id.* ¶ 66.) K.D.'s parents relayed this to "school administrators." (*Id.* ¶ 67.)

In early October 2016, I.P. bullied K.D. in an unspecified manner. (*Id.* ¶ 65.) K.D. reported this to a Doe Defendant "and was told to 'deal with it.'" (*Id.*)

Sherise Nipper then made another attempt to speak with Superintendent Spencer. (*Id.* ¶ 64.) She again was told by employees at the School District offices that she needed to fill out an online complaint form. (*Id.*) She responded that she did not have a computer and could not use one anyway due to her epilepsy, and asked whether Nicholas Nipper could come in to the School District office and use a School District computer to fill out the complaint. (*Id.*) The answer was no. (*Id.*)

## C.    The Stabbing Incident

Matters came to a head on October 7, 2016. That day, K.D. was walking through a Middle School hallway and noticed I.P. "walking towards [him] holding a pencil with the sharpened part of the pencil pointing towards [him]. K.D. was concerned that I.P.

8

would attempt to hurt K.D., therefore K.D. nudged I.P. and I.P. stabbed K.D. multiple times in the chest and shoulder with the sharp pencil." (*Id.* ¶ 71.) At first not realizing the extent of his injuries, K.D. went on to class, but had trouble breathing and so went with a friend, "D," to the nurse's office. (*Id.* ¶ 72.) A "health para-professional" at the nurse's office, Defendant Collins, told D and K.D. that they did not have the proper note to be excused from class, so K.D. laid down in the hallway outside the nurse's office while D went back to the classroom to obtain the proper note. (*Id.*) When D returned with the proper documentation, "there was a note on the nurse's office door that stated 'at lunch.'" (*Id.*)

K.D. remained prone on the hallway floor while "a teacher, a school administrator and an assistant principal" walked by without taking any action. (*Id.* ¶ 74.) Eventually a school counselor helped K.D. gain entrance into the nurse's office. (*Id.*) Ms. Collins then placed gauze and a bandage on K.D.'s wounds but did nothing more. (*Id.* ¶ 75.) K.D. reported the fight with I.P. to Principal Breske and Assistant Principals Delourenco and Glickman, but no one called for an ambulance. (*Id.* ¶ 76.)

Someone, however, called K.D.'s parents, who arrived soon after. (*Id.* ¶ 77.) K.D.'s parents then rushed K.D. to the local emergency room, where he was diagnosed with a stab wound to the right chest, a collapsed right lung, and a stab wound in the right lung. (*Id.* ¶¶ 77–78.) The attending physician believed K.D. needed treatment from a pediatric trauma center, so K.D. was taken by ambulance to Children's Hospital in Denver, where he underwent surgery to repair his punctured lung. (*Id.* ¶ 78.) K.D. remained in the hospital for two days. (*Id.*)

In the aftermath of the stabbing, K.D. has suffered from PTSD and suicidal

thoughts; he has become afraid to leave his house; and he has not returned to the Middle School. (*Id.* ¶ 81.) Sherise Nipper has left her job to home-school K.D., thus suffering a loss of wages. (*Id.*)

### III. ANALYSIS

#### A. Sherise Nipper's Standing

Defendants argue that Sherise Nipper has no standing to sue because Plaintiffs' four causes of action required discrimination of some sort and none of the alleged discrimination was directed at Sherise Nipper. (ECF No. 39 at 3–4.) Plaintiffs' entire response to this argument is as follows: "Plaintiffs concede that Ms. Nipper did not, herself, suffer discrimination. Her claims consist of economic damages she has incurred as a result of Defendants' discrimination of K.D." (ECF No. 48 at 3.)

Although framed by Defendants as a standing defect, there is no Article III standing problem in this case. By leaving her job to home-school K.D., Sherise Nipper has suffered an injury in fact (lost earning capacity) to a legally protected interest (money), allegedly caused by Defendants' failure to protect K.D. from bullying, and a damages award could redress her injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (basic elements of Article III standing are injury in fact to a legally protected interest, causation, and redressability). So the question is not standing *per se*, but instead whether a cause of action exists that permits her to seek redress for her injury. Here, Plaintiffs make no attempt to demonstrate that any of their causes of action encompass injuries suffered by parties who did not themselves suffer discrimination, but were affected by discrimination suffered by others. The Court therefore deems Plaintiff's to have conceded Defendants' argument that Sherise Nipper

cannot state a claim.  She will be dismissed as a Plaintiff.[1]

## B.      The District vs. the School Board

Defendants next argue that suing both the School Board and the School District

is redundant because the District is the entity subject to suit and encompasses the

Board.  (ECF No. 39 at 4–5.)  *See also* Colo. Const. art. IX, § 15 ("The general

assembly shall, by law, provide for organization of school districts of convenient size, in

each of which shall be established a board of education . . . ."); Colo. Rev. Stat. § 22-

32-101 ("Each regularly organized school district . . . is declared to be a body corporate

. . . and in its name it may . . . sue and be sued . . . ."); *Roe v. Karval Sch. Dist. RE23*,

2013 WL 1858464, at *7 (D. Colo. May 2, 2013) (school board is not a separate entity

from its school district); *cf. Dorsey v. Pueblo Sch. Dist. 60*, 140 F. Supp. 3d 1102, 1122

(D. Colo. 2015) (individual school not suable separately from its school district).

K.D. responds "that it is too early to determine whether one o[r] the other should

be dismissed."  (ECF No. 48 at 4.)  The Court disagrees.  The above authorities appear

unequivocal, and in any event Defendants' counsel have represented, as officers of the

Court, that "the District . . . is the proper Defendant here, as it is the corporate entity

which encompasses the Board."  (ECF No. 39 at 5.)  The Court will hold Defendants to

this representation and dismiss the School Board.

## C.      Title VI Liability

The School District receives federal funding.  (ECF No. 36 ¶ 9.)  K.D.'s first cause

---

[1] To be clear, the Court does not hold that Plaintiffs' causes of action may never encompass Sherise Nipper's lost earning capacity, or that there is no separate cause of action that might permit the sort of recovery she seeks.  The Court expresses no opinion either way on those matters.  *Cf. Taken Alive v. Litzau*, 551 F.2d 196, 199 (8th Cir. 1977) (mentioning in passing that a wife had claimed her husband's lost wages as damages in her § 1983 claim). The Court holds only that Plaintiffs have failed to rebut Defendants' argument in this regard.

of action, therefore, accuses the School District of violating Title VI, which prohibits racial discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The discrimination in question must be intentional. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

In a case such as this one involving student-on-student harassment, a plaintiff may prevail (including on the intentionality element) by showing that the school district "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) [racially motivated] harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Okla.*, 334 F.3d 928, 934 (10th Cir. 2003) (internal quotation marks omitted; emphasis removed). Deliberate indifference in this context can also be phrased as an "intentional choice to sit by and do nothing." *Id.* at 933.

Thus, even where school employees "did not necessarily create the [racially] hostile environment," a school district may still be liable if its employees "facilitated" the hostile environment or "permitted it to continue." *Id.* On the other hand, a district may avoid liability if it "respond[s] to known [student-on-student] harassment in a manner that is not clearly unreasonable." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999).[2] "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.*

---

[2] *Davis* was discussing sex-based discrimination under Title IX. The Tenth Circuit in *Bryant* explicitly equated the Title IX and Title VI claims and directed lower courts to draw upon *Davis* when evaluating Title VI claims. *See* 334 F.3d at 934.

Defendants' challenge to K.D.'s Title VI cause of action is mostly a collection of catchwords and phrases drawn from the *Twombly-Iqbal* lexicon ("conclusory," "mere recitation of the elements," etc.) and citations to the *concurring* opinion in the Tenth Circuit's *Bryant* decision—without acknowledging it as a concurring opinion. (*See* ECF No. 39 at 5–6 (citing and quoting from pages 937 and 938 of Chief Judge Tacha's concurring opinion in *Bryant*).) The Court is not convinced.

Without question, Defendants have their own side of the story. There are even hints of it in K.D.'s complaint, such as brief acknowledgments that Middle School administrators disciplined *him* for racial harassment (ECF No. 36 ¶¶ 56, 61) and the statement that he was the first to make physical contact with I.P. by intentionally "nudg[ing]" him (*id.* ¶ 71). But K.D.'s well-pleaded allegations, which the Court must accept as true in this posture, are sufficiently detailed and specific to state a plausible claim. K.D.'s parents repeatedly complained to Middle School employees, thus satisfying the "actual knowledge" element of a Title VI claim. *Bryant*, 334 F.3d at 934. Allegedly, the Middle School repeatedly ignored these complaints, and some employees even ignored K.D. as he lay injured outside the nurse's office, which is enough at this pleading phase to establish the "deliberate indifference" element. *Id.* As for whether the harassment was sufficiently "severe, pervasive and objectively offensive," *id.*, Defendants make no argument that this element is not satisfied, and so the Court deems it conceded for present purposes. Finally, K.D. plausibly alleges that the harassment "deprived [him] of access to the educational benefits or opportunities provided by the school." *Id.* Indeed, on more than one occasion, his encounters with

bullies on the way to school led him to turn around and go home.[3]  Accordingly, the

Court rejects Defendants' Rule 12(b)(6) challenge to K.D.'s Title VI claim.

**D.      Section 1983 Liability (Fourteenth Amendment Equal Protection Clause)**

"The Equal Protection Clause of the Fourteenth Amendment commands that no

State shall 'deny to any person within its jurisdiction the equal protection of the laws,'

which is essentially a direction that all persons similarly situated should be treated

alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To

state an Equal Protection violation, a party must plead that he or she was treated

differently than others similarly situated.  *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d

504, 532 (10th Cir. 1998).

K.D. claims that the individual Defendants and the School District discriminated

against him in violation of the Equal Protection Clause on account of his race and

disability status.[4]  The Court will first discuss the potential individual liability, and then

the School District's potential liability.

1.      Individual Defendants & Qualified Immunity

The Individual Defendants argue that they are qualifiedly immune from whatever

_____

[3] Obviously the most dramatic point in K.D.'s narrative is the stabbing, leading to his
hospitalization and current status as a homeschool student.  That too might be evidence of
educational deprivation.  But whether it should be considered as such appears to depend in part
on whether the School District was reasonably aware of the potentially violent nature of the
harassment.  *Cf. Farmer v. Brennan*, 511 U.S. 825, 843–44 (1994) (in the Eighth Amendment
deliberate indifference context, observing that a pattern of violence known to prison officials may
be enough to hold them liable to the eventual victim of such violence, even if the officials could
not predict that the specific victim would be attacked).  The Court does not address that here
because the Court finds that the alleged acts and omissions before the stabbing incident are
enough to overcome Defendants' Rule 12(b)(6) arguments.

[4] Race-based discrimination is evaluated more strictly than disability-based
discrimination.  *See Cleburne*, 473 U.S. at 439–47.  This distinction is not material for present
purposes.

Equal Protection violation K.D. has alleged. (ECF No. 39 at 7–10.) "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Even at the Rule 12(b)(6) stage, the plaintiff bears the burden to "allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

Here, K.D. makes no attempt to show that the law of Equal Protection in the

context of school administration and student discipline was clearly established beyond a

single sentence baldly declaring that "Defendants in this case violated clearly

established rights."  (ECF No. 48 at 12.)  This is a particularly important omission given

how sparse the accusations are against each of the individual Defendants:

**Superintendent Spencer.**  The accusations against him are inconsistent, *i.e.*,

that K.D.'s parents informed him of the bullying and were also unable to inform him of

the bullying due to the online-complaint requirement.  K.D.'s response does not help

when it asserts that "[t]he obvious implication" of the allegations against Spencer "is that

he is in charge of making and implementing the policy where the Nippers could not

make complaints to him because of their lack of computer access.  In doing so,

Defendant Spencer acted with deliberate indifference."  (ECF No. 48 at 12.)  But

"deliberate indifference" is a Title VI standard, not an Equal Protection standard.[5]

Regardless, it is K.D.'s burden to show it was clearly established at the relevant time

that a person who does not know about unconstitutional discrimination can be held

---

[5] In a single sentence, not elaborated upon, K.D. argues in his response brief that Defendants can be liable under § 1983 because they "have violated [his] rights under Title VI." (ECF No. 48 at 11.)  The Court ignores this argument for two reasons.  First, K.D.'s § 1983 cause of action clearly announces that it is based in the Equal Protection Clause (*see* ECF No. 36 at 31; *see also id.* ¶¶ 97, 105, 109), and a party may not amend the complaint through the response to a motion to dismiss, *see, e.g.*, *Young v. Dollar Tree Stores, Inc.*, 2012 WL 3704994, at *3 (D. Colo. Aug. 24, 2012).  Second, to this Court's knowledge, the federal courts are so far unanimous in holding that Title VI does not permit suits against individuals.  *See, e.g.*, *Shotz v. City of Plantation*, 344 F.3d 1161, 1170 (11th Cir. 2003) ("the text of Title VI . . . precludes liability against those who do not receive federal funding, including individuals"); *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996) ("Plaintiff's claim also fails because she asserts her claim against Lawson and Weaver and not against the school, the entity allegedly receiving the financial assistance"); *Verdi v. City of New York*, 306 F. Supp. 3d 532, 542 (S.D.N.Y. 2018) ("Title VI does not provide for individual liability").  If § 1983's mention of "deprivation of any rights, privileges, or immunities secured by the Constitution *and laws*" (emphasis added) could nonetheless permit an individual to be sued for Title VI violations, it would work an end-run around Congress's apparent intent to limit Title VI liability to institutions receiving federal funding.  Without substantial briefing from Plaintiff on this point, the Court is not prepared to rule that § 1983 may be used in this manner.

liable for such discrimination by setting up an online reporting system that some persons might not be able to use. K.D. has not attempted to make the showing.

**Principal Breske.** The only accusation against her specifically is that she brushed off a particular report of bullying with a "boys will be boys" comment. (ECF No. 36 ¶ 47.) K.D. has not alleged that Principal Breske chose to do so out of animus toward K.D.'s race or disability. Nor has K.D. attempted to make a showing that the law clearly establishes the Equal Protection liability that might flow from this isolated incident.

**Assistant Principal Delourenco.** The only accusation against him specifically is that he failed to act on a report of bullying at the Elementary School, over which he was not an assistant principal. (*Id.* ¶ 41.) Again, K.D. has not alleged that his inaction was motivated by animus toward K.D.'s race or disability, nor attempted make a showing that the law clearly establishes the Equal Protection liability that might flow from this isolated and unusual report of bullying.

**Assistant Principal Glickman.** The accusations against her are more substantial. She was also someone to whom K.D.'s parents reported an act of bullying at the Elementary School, over which she was not an assistant principal. (*Id.*) Putting that aside, however, K.D.'s parents twice complained to Glickman: once about the "weed pimp"/"white power" incident (*id.* ¶ 55), and again after a gang of Hispanic boys from another school joined likeminded boys at the Middle School to wait at the bike rack for K.D.'s arrival (*id.* ¶ 61). Even so, K.D. still provides no plausible allegations that Assistant Principal Glickman ignored these complaints out of animus toward K.D.'s race or disability. And again, K.D. fails to show that the law clearly establishes the Equal

Protection liability that might flow from these circumstances.

*Ms. Collins (health para-professional).* The accusations against her are more specific compared to those made against the other individual defendants. She initially refused to treat K.D. because he lacked the proper note to be excused from class; then she put an "at lunch" sign on her door, leaving K.D. out in the hallway for some time; then she provided inadequate treatment to K.D. when she finally saw him. (*Id.* ¶¶ 72–75.) But, reprehensible as these alleged actions may be, there is still no plausible allegation that Ms. Collins acted out of animus toward K.D.'s race or disability. And as before, K.D. fails to argue that the law clearly establishes the Equal Protection liability that might flow from these accusations.

\* \* \*

Accordingly, K.D.'s § 1983 claim will be dismissed without prejudice as against Defendants Spencer, Breske, Delourenco, Glickman, and Collins.

2.  The School District

K.D. seeks to hold the School District liable through the doctrine first announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Monell* held that a municipal entity can be liable for damages under 42 U.S.C. § 1983 if the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694. *Monell* liability can also extend to a municipal entity's failure to train its employees "if a violation of federal rights is a highly predictable or plainly obvious consequence of" that lack of training. *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998).

Similar to their challenge to the Title VI claim, Defendants bring a *Twombly-Iqbal* based challenge against K.D.'s *Monell* theory. Here, however, the challenge has more

merit. While a Title VI claim can exist without race-based animus on the part of any official (because a recipient of federal funds can be liable for allowing private persons' race-based animus to continue unchecked), a *Monell* claim based on the Equal Protection Clause requires allegations that the municipality had a custom, policy, or practice of treating similarly situated groups differently; or that the municipality failed to implement policies or training to address a known risk that its employees would treat similarly situated groups differently. K.D. provides no plausible allegations that either circumstance existed. Instead, he finishes his account of what happened to him (up through his hospitalization) and then simply announces that the District "failed to implement policies and procedures and/or failed to train employees regarding policies and procedures on anti-bullying and/or failed to enact such policies and procedures, which would have deterred and ended the bullying against [him]." (ECF No. 36 ¶ 79.) He later separates all of these theories into individual paragraphs and adds "based on racial status and disability" after "bullying," but still provides no supporting allegations. (*Id.* ¶¶ 101–05.)

Consequently, K.D. has failed to plausibly allege any Equal Protection violation that can fairly be said to flow from a School District policy, custom, or failure to train. K.D.'s § 1983 claim against the School District will be dismissed without prejudice.

## E. Rehabilitation Act & ADA Liability

The Rehabilitation Act and the ADA both provide a cause of action similar to the Title VI deliberate indifference cause of action, except that the discrimination in question is motivated by disability rather than race. *See J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 n.6 (10th Cir. 2016); *Woodman v. Runyon*, 132 F.3d 1330, 1339 n.8 (10th Cir. 1997); *Ulibarri v. City & Cnty. of Denver*, 742 F. Supp. 2d 1192, 1212–13 (D. Colo.

2010). Thus, liability can flow from "knowledge that a harm to a federally protected right is substantially likely, and a failure to act [on that knowledge]." *J.V.*, 813 F.3d at 1298.

Here, K.D. alleges only a single instance of bringing potential disability-motivated discrimination to any School District employee's attention. This was in late September 2016 when K.D.'s parents reported to "District authorities" that K.D.'s toe-walking led to an argument with "other children" at the Middle School. (ECF No. 36 ¶ 52.) This isolated incident, with no details or other supporting allegations, fails to "nudge[] [K.D.'s Rehabilitation Act and ADA] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. They will thus be dismissed without prejudice.

## F. Timeliness Defense

In a footnote to the Motion to Dismiss, Defendants assert the following (apparently incomplete) argument:

> To the extent that Plaintiffs attempt to characterize any act or omission on the part of the Defendants occurring during K.D.'s time as a student at Pikes Peak Elementary [S]chool, such acts or omissions cannot support a § 1983 claim unless they are alleged to have occurred after January 8, 2016.
> *See Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006).

(ECF No. 39 at 7 n.2.) Obviously the reader expects "characterize" to be connected to an "as" clause that never arrives (*e.g.*, "characterize as relevant"). But January 8, 2016 is two years before K.D. filed the currently operative complaint (ECF No. 36), and the cited page from *Fogle* sets forth the proposition that "the statute of limitations for § 1983 actions brought in Colorado is two years from the time the cause of action accrued." 435 F.3d at 1258. Thus, Defendants are apparently arguing that all acts before January 8, 2016 "cannot support" § 1983 liability due to the passage of time.

Plaintiffs did not respond to this footnote. (*See generally* ECF No. 48.) Then, in

Defendants' reply brief they reiterate the argument without any connection to § 1983 specifically, thus apparently expanding it to encompass all causes of action. (ECF No. 51 at 2.) This prompted a Motion to Strike from Plaintiffs based on the allegedly new reply-brief argument. (ECF No. 55.) The Court denied that motion as moot because the Court self-polices untimely arguments. (ECF No. 56.) The Court's analysis of this matter is as follows.

Arguments raised but inadequately developed in an opening brief may be deemed forfeited. *See, e.g.*, *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008); *Rojem v. Gibson*, 245 F.3d 1130, 1141 n.8 (10th Cir. 2001). Defendants' opening-brief footnote was inadequately developed. The sentence was grammatically incomplete and otherwise requires a series of inferences to understand the gist of the argument. But the Court need not deem it forfeited because it was directed at the § 1983 cause of action, which the Court has dismissed in its entirety on other grounds. As for the re-urging of the argument in the reply brief, its apparent expansion to all causes of action *is* a new argument and the Court deems it forfeited at this stage. *See, e.g.*, *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (new reply brief arguments are forfeited).[6]

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Defendants' Motion to Dismiss (ECF No. 39) is GRANTED to the following

        extent, but otherwise DENIED:

---

[6] To the extent this argument may resurface at a later stage, the Court urges the parties to consider the difference between evidentiary relevance and the accrual of a cause of action. Statutes of limitations apply to causes of action, but they do not necessarily bar evidence of events that took place outside of the limitations period.

a.   Plaintiff Sherise Nipper in her individual capacity is TERMINATED as a party;

b.   Defendant Harrison School District Two Board of Education is TERMINATED as a party;

c.   Plaintiff K.D.'s 42 U.S.C. § 1983 cause of action is DISMISSED WITHOUT PREJUDICE as against all Defendants save for "John Doe"[7] and Does 1 through 10;

d.   Defendants Spencer, Breske, Delourenco, Glickman, and Collins are TERMINATED as parties;

e.   Plaintiff K.D.'s causes of action under the Rehabilitation Act and the ADA are DISMISSED WITHOUT PREJUDICE; and

2.   The stay of discovery (ECF No. 42) is LIFTED and the parties are DIRECTED to contact the chambers of U.S. Magistrate Judge N. Reid Neureiter no later than **September 20, 2018** to begin the process of preparing a revised scheduling order.

Dated this 18th day of September, 2018.

BY THE COURT:

William J. Martinez
United States District Judge

---

[7] As far as the record reveals, John Doe (the gym teacher who misinterpreted "WP4L" as a white power reference) has not been positively identified or served with process. The Motion to Dismiss does not name him as a party to the motion. (*See* ECF No. 39 at 1.)