**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-2391-WJM-NRN

K.D., by his next friend and parent, Sherise Nipper,

     Plaintiff,

v.

HARRISON SCHOOL DISTRICT TWO,

     Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S SUMMARY JUDGMENT MOTION**

---

In this lawsuit, Plaintiff K.D. ("Kyler"),[1] through his mother, Sherise Nipper ("Mrs. Nipper"), sues Defendant Harrison School District Two ("School District"), alleging that the School District took no steps to stop pervasive bullying against Kyler at school. This bullying, Kyler says, was race-motivated (he is white and attended a majority Hispanic school) and disability-motivated (at the relevant time, Kyler had an Achilles tendon deformity that affected the way he walked). Kyler therefore alleges racial discrimination

---

[1] As the caption shows, this action has thus far proceeded under the initials "K.D." However, the Third Amended Complaint contains a verbatim quote from Kyler's Facebook page in which he identifies himself as "Kyler Nipper." (ECF No. 74-2 ¶ 30.) Moreover, the matters recounted below have since received national press coverage, and that press coverage uses Kyler's real first name. *See, e.g.*, Cathy Free, "This 14-year-old was stabbed by bullies who mocked his shoes. He now collects shoes and gives them to those in need.", Wash. Post (Sept. 30, 2019), *at* https://www.washingtonpost.com/lifestyle/2019/09/30/he-was-stabbed-by-bullies-who-mocked-his-shoes-he-now-collects-shoes-gives-them-those-need/ (last accessed Apr. 3, 2020); Liz Lane, "Bullied for His Kicks, This 14-Year-Old Started a Charity That Gives Shoes to People in Need," InsideEdition.com (Sept. 14, 2019), *at* https://www.insideedition.com/bullied-for-his-kicks-this-14-year-old-started-a-charity-that-gives-shoes-to-people-in-need-55839 (last accessed Apr. 3, 2020). Thus, the Court sees no need to continue using his initials only.

in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. §§ 2000d *et seq.*; disability discrimination in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "§ 504"), 29 U.S.C. §§ 794 *et seq.*; and disability discrimination in violation of Title II the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*

Currently before the Court is the School District's Motion for Summary Judgment. (ECF No. 107.)  As explained in this order, the Court will grant the School District's motion as to Kyler's Rehabilitation Act and ADA claims, but deny it as to his Title VI claim.  This matter therefore remains set for trial on the Title VI claim.

## I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTS

The following narrative is undisputed unless attributed to a party or otherwise noted.

### A.    Pikes Peak Elementary

1.    <u>Enrollment and Early Interactions with the Administration</u>

Sometime before his fifth-grade year (2015–16), Kyler moved with his mother and stepfather, Nicholas Nipper ("Mr. Nipper"), from Texas to Colorado so Mrs. Nipper could obtain medical marijuana to manage her epilepsy.  (ECF No. 120 at 20, ¶ 153.)[2] The Nippers enrolled Kyler at Pikes Peak Elementary School ("Pikes Peak") (a school in the School District) for fifth grade, which began in August 2015.  (ECF No. 107 at 4, ¶ 16.)

As part of enrollment, Mrs. Nipper filled out a "Student Health Form" where she checked "No" in response to the question, "Is this child under medical care?"  (ECF No. 110-3 at 11.)  The form also had checkboxes for specific medical conditions, including "Bone/Joint Disease," but Mrs. Nipper did not check any of those boxes.  (*Id.*) However, Mr. Nipper says that that sometime before an October 5, 2015 report of bullying (described below), he and his wife met with the Principal, Linda Donaldson, to say that Kyler needed extra attention because this was his first time in a "brick-and-mortar school" and he was being picked on because "he kind of walked funny."  (ECF

---

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

No. 120-7 at 4–5; *see also* ECF No. 107 at 6, ¶ 26.)[3]  Specifically, he tended to walk on his tip-toes.  (ECF No. 120 at 16, ¶ 141.)  At the time, Mr. and Mrs. Nipper thought that his walking style was just a habit that he needed to overcome.  (ECF No. 133-1 at 6.)

Despite his walking style, Kyler walked to and from Pikes Peak on most school days, although his parents might drive him on bad-weather days.  (ECF No. 107 at 5, ¶ 18; ECF No. 110-4 at 2–3.)

2.  <u>Bullying that Happened on a Specific Date</u>

As far as the record reveals, there were three instances of bullying or similar behavior against Kyler at Pikes Peak that can be assigned to a date certain.  They are as follows.

On August 31, 2015, Mrs. Nipper reported to Pikes Peak that a student named Sasha had called Kyler "fat."  (ECF No. 107 at 5, ¶ 22.)  Assistant Principal Angela Valdez decided that punishment was not warranted because Sasha's "behavior log" was otherwise clean.  (ECF No. 120-5 at 12.)  She nonetheless told Mrs. Nipper that she would ensure that Kyler and Sasha were separated, as a precaution.  (ECF No. 107 at 5, ¶ 24.)  There were no further incidents between Kyler and Sasha.  (*Id.* ¶ 25.)

On October 5, 2015, Mrs. Nipper told Principal Donaldson that Kyler had been bullied, and that Kyler's teacher, Jonathan Francis, was the only person in the school helping Kyler.  (*Id.* at 6, ¶ 26.)  The parties point the Court to nothing in the record providing details about how Kyler had been bullied, but Mrs. Nipper asserts that this

---

[3] Despite Mr. and Mrs. Nipper's representations to Principal Donaldson, this was not Kyler's first time in a brick-and-mortar school.  Kyler attended kindergarten through third grade at an elementary school in San Antonio, Texas.  (ECF No. 107 at 3, ¶ 1.)  He "reportedly attended online classes" for fourth grade.  (*Id.* at 4, ¶ 15.)

was not the first time she had called Principal Donaldson about bullying.  (ECF No. 120 at 4, ¶ 23.)

On April 27, 2016, "RF," a white student at Pikes Peak, hit Kyler in the head.  (*Id.* ¶ 27.)  Kyler "believed RF hit him because RF was 'having a bad day,' and 'his parents were really arguing.'"  (*Id.* ¶ 28.)  Either that same day or the next, Principal Donaldson punished RF by suspending him for one day.  (*Id.* ¶¶ 29–30; ECF No. 120 at 4, ¶ 29.)

### 3.   Racial Bullying

Kyler suffered other instances of bullying at Pikes Peak that cannot be assigned to a specific date.  In particular, he had trouble with two students, "IP" and "GZ."  (ECF No. 107 at 7, ¶ 37.)  GZ would use his chest to push Kyler in the school hallways, and IP would use his shoulder to bump Kyler in the hallways.  (*Id.* ¶¶ 38–39.)  On at least one occasion, GZ's and IP's behavior caused bruises on one of Kyler's arms, but he told his parents that the bruises came from playing football, which was a plausible explanation because he played football in gym class and sometimes received bruises from that.  (ECF No. 110-2 at 4–5.)

GZ and IP also called Kyler names such as "white," "chicken nugget," "cracker," and "Swiss cheese."  (*Id.* ¶¶ 41–43.)  They would do so under their breath, to prevent others from hearing, and Kyler says that sometimes they provoked an audible reaction from him that got him in trouble for being disruptive.  (*Id.* ¶¶ 41–42; ECF No. 110-2 at 3.)  School records confirm that Kyler was repeatedly referred to the Principal's or Assistant Principal's office during the school year for "negative behaviors and interactions with his classmates."  (ECF No. 107 at 5, ¶ 19.)  Kyler claims he was consistently "disciplined for his reactions to harassment by other students, often the same group of students who bullied him" (referring at least to IP).  (ECF No. 120 at 3, ¶ 19.)

Kyler perceived GZ as "a mix between African American and Hispanic." (ECF No. 110-2 at 3.) In her deposition testimony, Mrs. Nipper referred to IP as part of a "group of Hispanic kids." (ECF No. 120 at 19, ¶ 151.) The School District's Rule 30(b)(6) representative testified to her belief that IP was Hispanic, and approximately 60% of the Pikes Peak student population was Hispanic. (*Id.* at 16, ¶ 140.) But IP's official School District record says that he is "White, not Hispanic." (ECF No. 135-1.)

In any event, Kyler remembers telling Mr. Francis about GZ's and IP's racist language toward him, but he does not remember what happened after that. (ECF No. 110-2 at 3.) In general, Mr. Francis was teaching Kyler to "ignore [the bullying] and change it into a positive thing." (*Id.*)

Once in music class, one of GZ's friends, who was Hispanic, kicked Kyler in the back of the head. (ECF No. 107 at 8, ¶ 49; ECF No. 110-2 at 8.) Kyler claims that he told his teacher, who did nothing, and so Kyler left the class, went to the office, and convinced the administrators to let him transfer to an art class. (*Id.*)

On a separate occasion, another of GZ's friends, also Hispanic, told Kyler that he "should just go kill himself." (ECF No. 107 at 8, ¶ 53; ECF No. 110-2 at 6.)

Kyler told his mother about these incidents, but he did not tell her that the students were Hispanic. (ECF No. 107 at 7–9, ¶¶ 47, 54.)

    4.   <u>Bullying Based on Toe-Walking</u>

Kyler was also harassed over the way he walked: "Students at [Pikes Peak] told [Kyler] that he 'lived in a dumpster,' said that his feet were 'funny shapes,' made fun of 'the way [he] walked,' and made fun of his shoes for 'being worn down and trashy.'" (*Id.* ¶ 48.) In Kyler's words, these insults grew from the fact that "I walked on my tippy toes, and then they would—my shoes would get worn out really quick, and then [kids] would

laugh at me and make comments about my feet." (ECF No. 120 at 16, ¶ 141.)

     5.   <u>End-of-Year Summary</u>

Kyler missed sixteen days of school in fifth grade—mostly because, according to

Mr. Nipper, "we could not get him to go . . . . He just had had enough of the

bullying . . . ." (ECF No. 107 at 8, ¶¶ 57–58; ECF No. 120-7 at 5.)[4]

Kyler says he talked to Principal Donaldson "20 to 25 times about being bullied"

and told her "the names of the students who bullied him," but he never specifically

complained of bullying on account of race or disability. (*Compare* ECF No. 107 at 9,

¶ 60 *with* ECF No. 120 at 7, ¶ 60.)

Mr. Nipper asserts that at least Principal Donaldson was aware of bullying based

on toe-walking because of his early-in-the-year conversation with her in which he said

that Kyler "kind of walked funny." (*See* Part II.A.1, above.) The School District claims

that no teacher or administrator at Pikes Peak apart from Kyler's teacher, Mr. Francis,

had knowledge that Kyler was being bullied on the basis of race, and Kyler's summary

judgment response brief appears to admit as much. (*Compare* ECF No. 107 at 9,

¶¶ 61–62 *with* ECF No. 120 at 7, ¶¶ 61–62; *see also* ECF No. 110-2 at 3.) However,

---

[4] Kyler says that his absences, by quarter, were two, four, eight, and sixteen, respectively, thus showing the increasing effect the bullying was having on him throughout the year. (ECF No. 120 at 24, ¶ 173; *id.* at 40.) There are two problems with this assertion. First, earlier in the same brief, Kyler admits, without qualification, the School District's assertion that Kyler had sixteen *total* absences for the year. (*See id.* at 7, ¶ 57.) Second, in support of his claim about increasing absences by quarter, he cites "Ex 17, at 11:6–23." (*Id.* at 24, ¶ 173.) Kyler has no exhibit labeled Exhibit 17, although he does have a seventeenth exhibit, in the sense of an unlabeled exhibit that follows Exhibit 16. (*See* ECF No. 120-17.) But that exhibit is an expert report regarding Kyler's current medical condition. It says nothing about absences. Although the Court has no duty to do so, *see* Fed. R. Civ. P. 56(c)(3); *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995), the Court nonetheless looked at every deposition transcript Kyler submitted ("11:6–23" is obviously a deposition citation). Most of the transcripts do not have a page 11. The pages 11 that *do* exist say nothing about Kyler's attendance. Accordingly, the Court disregards Kyler's assertion that his absences increased over time.

Mr. and Mrs. Nipper also claim they frequently complained of racial harassment to School District employees.  (*See* Part II.B.9, below.)

## B.      Carmel Middle School

### 1.      Enrollment and Early Interactions with the Administration

Kyler enrolled in Carmel Middle School, also within the School District, for sixth grade.  (ECF No. 107 at 9, ¶ 63.)  Apparently in anticipation of participating in sports there, Mrs. Nipper filled out a "Preparticipation Physical Evaluation History Form" for Kyler on May 25, 2016.  (ECF No. 110-3 at 14.)  This form is a check-the-box form similar to the one Mrs. Nipper filled out for Pikes Peak the year before, except it asks about many more potential conditions.  (ECF No. 110-3 at 14.)  Mrs. Nipper checked "No" for every potential condition, including conditions relating to bone, joint, and muscle disease, or the need for braces, orthotics, or other assistive devices.  (*Id.*)

On August 1, 2016, a physician at a clinic connected to Carmel (called "Entrada") conducted a school-mandated physical examination on Kyler and filled out a form stating that Kyler had no abnormalities and was "cleared without restrictions" for "participation in athletics."  (*Id.* at 13 (capitalization normalized).)  However, although the form plainly says what it says, Kyler and Mr. Nipper both remember that this Entrada physician "said that [Kyler] couldn't pass his physical because his Achilles tendon was not long enough."  (ECF No. 133-1 at 5–6; *see also* ECF No. 120 at 8, ¶ 65.)  Then, they say, that physician referred them to a specialist, from whom they learned for the first time that Kyler's tip-toe walking behavior was a physical disability caused by too-short Achilles tendons, which needed to be stretched out either through surgery or special casts.  (ECF No. 133-1 at 6.)  Mr. Nipper is uncertain precisely when they received this diagnosis from the specialist.  (*See* ECF No. 133-1 at 5.)

The school year started on August 16, 2016 (ECF No. 107 at 9, ¶ 67), and on August 22, 2016, Mrs. Nipper filled out another check-the-box "Student Health Form" for Kyler (identical to the form she filled out the year before, *see* Part II.A.1, above) on which she again checked "No" in response to the question, "Is this child under medical care?" (ECF No. 110-3 at 12).  Also as before, she did not check any of the potential medical conditions, such as "Bone/Joint Disease."  (*Id.*)

      2.   <u>Continued Bullying and Similar Behavior Early in the School Year</u>

Kyler missed the first four days of sixth grade "due to his parents believing they were going to buy a house." (ECF No. 107 at 9, ¶ 67.)[5]  But when he arrived at school on the fifth day, IP resumed bullying him for the first couple of days. (*Id.* ¶ 69.)[6]  Kyler says that IP "was just doing the same stuff [as at] Pikes Peak." (ECF No. 120 at 8, ¶ 70.)  But after those first few days, Kyler and IP had no interactions until midway through September (described below).  During that hiatus, however, Kyler had two experiences of feeling threatened.

The first experience happened in the morning of the school day as Kyler rode his bike to school and "encountered a group of students near the bike rack." (ECF No. 107 at 10, ¶¶ 72, 74.)  Regarding this incident, Kyler testified at his deposition that he "didn't

---

     [5] Kyler denies this assertion on grounds that "[t]he cited documents do not support this fact." (ECF No. 120 at 8, ¶ 67.)  But the cited documents are Carmel's attendance register, showing that Kyler was absent on the first four days of school (ECF No. 111-1); and an intra-school e-mail reporting that Mrs. Nipper had come to the office on Kyler's first day of attendance, explaining that Kyler had been gone the previous four days because she and Mr. Nipper "thought they would close on their house," which would be within the boundaries of a different middle school (ECF No. 110-6 at 5).  Accordingly, the objection that the cited documents do not support the fact is groundless, and the Court deems both his absences and the reason for them undisputed.

     [6] GZ did not attend Carmel.  (*Id.* ¶ 68.)

really recognize them," but also that "some of the kids that bullied me before were there." (ECF No. 110-2 at 9.)  In any event, he did not want to approach the students (to lock up his bike, presumably), so he turned around and rode home.  (ECF No. 107 at 10, ¶ 74.)  The record is unclear whether he stayed home for the rest of that day.

The second experience happened on the morning of September 14, 2016, as Kyler was again riding his bike to school.  (*Id.* ¶ 75.)  At some point along that journey, he came into view of Carmel "and there was just a big bunch of kids" outside one of its entrances.  (ECF No. 110-2 at 10.)  "And then one kid was coming [toward Kyler] because he forgot his backpack at home, and he told [Kyler] that all those kids were looking for [him]."  (*Id.*)  "Thinking it sounded 'weird,' [Kyler] 'turned around, went back home' and told his parents."  (ECF No. 107 at 10, ¶ 77.)  His parents then drove him back to school.  (ECF No. 110-2 at 10.)

Carmel Principal Lorna Breske and Assistant Principal Sergio de Lourenco either met or spoke with Mr. Nipper that same day regarding the September 14 incident.  (ECF No. 107 at 10, ¶ 78.)  Apparently Kyler's current memory of the incident is very limited (or the story got somewhat inflated in the retelling of it) because de Lourenco's notes say that Mr. Nipper reported "a group of students chas[ing] [Kyler] home threatening to fight and steal his bike.  [Mr. Nipper] reported that some from this group showed up at his house threatening to break in and steal the bike and mess up the house."  (ECF No. 120-3 at 6.)  De Lourenco's notes further state that he learned from a Carmel student that the group of students attended a different middle school, but they would catch the bus at Carmel.  (*Id.*)  De Lourenco contacted the other middle school about the incident.  (*Id.*; ECF No. 107 at 11, ¶ 80.)

3.     <u>September 15 Altercation with IP and Others</u>

On September 15, 2016, Kyler, IP, and two other boys got into an altercation involving pushing, punching, name-calling ("bitch" and "pussy," reportedly said by Kyler to IP or the others), and threats of violence (IP reportedly said that his group "would jump [Kyler] later").  (ECF No. 107 at 11, ¶ 81; ECF No. 120 at 9, ¶ 81.)  An assistant principal, Monica Glickman, took statements from each of the boys involved.  (ECF No. 107 at 11, ¶ 82.)  "[N]one of the students reported race- or disability-based comments . . . ."  (*Id.*)  Notes regarding the incident show that someone at Carmel called Mr. Nipper and the mother of one of the other students involved to discuss the incident, but the notes say nothing either way about whether anyone called IP's parents.  (*See* ECF No. 111-4.)

4.     <u>Kyler's Suspension for Alleged Racial Slurs</u>

On September 20, 2016, two students complained to a teacher that Kyler was "calling them the 'N word' and [was] taunting them and calling them gay."  (ECF No. 111-2 at 1.)  Kyler's version of the story was that the students had called *him* names, not the other way around.  (ECF No. 120 at 10, ¶ 84.)  Carmel suspended Kyler for three days, beginning September 22, 2016.  (ECF No. 107 at 11, ¶ 84.)

5.     <u>Kyler's Casts</u>

During Kyler's suspension, he had casts placed on both legs to correct his Achilles deformity.  (*Id.* ¶ 85.)  Carmel also worked with Mr. and Mrs. Nipper on a § 504 plan to accommodate the limitations that Kyler's casts were expected to create over the next four weeks.  (*Id.* ¶ 87.)  For example, he would receive "transportation to and from school due to difficulty walking and balancing," he was "excused from participating in activities involving walking/running," and he was permitted to leave class "one to two

minutes early to get to his next class on time." (*Id.* ¶ 88 (internal quotation marks omitted).)

The School District says that this is the first time any teacher or administrator at Carmel learned of Kyler's impairment, and that no one at Carmel knew of any harassment based on disability. (*Id.* ¶¶ 89. 95.) The Nippers counter with Mr. Nipper's memory that he met with Principal Breske sometime between the Achilles deformity diagnosis and placement of the casts on Kyler's legs. (ECF No. 120 at 10, ¶ 89.) He says he told Principal Breske "that we were trying to at that point to get him rehabilitated for his walking so that kids would stop talking about him and his walking," and Principal Breske responded that she had observed other kids "making fun of the way [Kyler] walked." (*Id.* (internal quotation marks omitted).)

6.   The Attendance Contract

Around the same time the § 504 plan was formulated, Mr. Nipper came to the school to sign an "attendance contract" due to Kyler's "5+ Unex[cused]" absences. (ECF No. 111-2.) Kyler provides no additional context about this attendance contract.

7.   Potential Racial Harassment

At some point during Kyler's sixth grade year (before he withdrew from school, as described below), certain students "spoke to [Kyler] in Spanish," and Kyler "did not know what the Spanish words meant." (ECF No. 107 at 12, ¶¶ 93–94.) Kyler says that the students were a "group of Hispanic kids that bullied me." (ECF No. 120 at 11, ¶ 93.) Mr. Nipper remembers that Kyler came home and googled two words he remembered, "Guerro and Payaso, which mean 'white boy' and 'clown.'" (*Id.* ¶ 95.)

Mr. Nipper claims that he spoke with Principal Breske and Kyler's school counselor "specifically" about Kyler being bullied on account of race. (ECF No. 120

at 10–11, ¶¶ 89, 95.)  He remembers telling Principal Breske about "Spanish-speaking kids that were constantly heckling my son and, you know, saying things about him in Spanish and picking on him."  (*Id.* ¶ 95.)

8. The "WP4L" Incident

As previously noted, the Nippers moved to Colorado so Mrs. Nipper could obtain medical marijuana.  (*See* Part II.A.1, above.)  Mrs. Nipper obtained her marijuana from a dispensary called Weed Pimp Nation.  (ECF No. 120 at 20, ¶ 153.)  Someone at the dispensary wrote "WP4L" on one of Kyler's leg casts, meaning "Weed Pimp for life." (*Id.*)  Soon after, Kyler was in gym class at school and his teacher asked him—within earshot of other students, including IP—whether "WP4L" stood for "white power for life." (*Id.*)  Kyler said no, but "the bullying got worse" after this.  (*Id.*)  The record does not say whether the Carmel administration learned of this incident.

9. Frequency of Complaints

Mr. and Mrs. Nipper say that, by this time (late September/early October 2016), they had called School District employees eighty-four times (inclusive of the previous school year) to complain that Kyler was being bullied "based on how he walked or his race."  (*Id.* at 20–21, ¶¶ 157–58.)[7]  According to Mr. Nipper, they were "turned away" "90 percent of the time."  (*Id.* ¶ 155.)

---

[7] The Court recognizes that this may be a somewhat unreliable number, given that Mr. and Mrs. Nipper proffered phone records to support their memories, yet those phone records mostly show short telephone calls, and some of the calls are incoming, not outgoing. (*See* ECF No. 133 at 12, ¶¶ 157–58.)  Nonetheless, Mr. Nipper's memory was that "there was probably 60, 70 times that we reached out to somebody in the school District to tell them about why [Kyler] was being bullied."  (ECF No. 120 at 20, ¶ 155.)  The Court finds the precise number unimportant to the analysis below.  The important point is that there is some evidence of frequent communication with the School District.

10.   <u>The Stabbing</u>

Kyler's last day at Carmel turned out to be October 7, 2016.  That day, IP approached Kyler in the school hallway and—apparently unprovoked—stabbed Kyler multiple times with a pencil.  (ECF No. 107 at 12, ¶ 96.)  Kyler nonetheless attended the first ten minutes of his next class, but then left with a friend and went to the front office, asking to see the school nurse.  (*Id.* at 13, ¶¶ 97–98.)  Eventually Kyler's parents picked him up from school.  (*Id.* at 15–16, ¶¶ 126–28.)  Principal Breske called Mrs. Nipper later that night and learned that Kyler had been taken to the hospital with a punctured lung.  (*Id.* at 16, ¶ 133.)

11.   <u>Withdrawal from School</u>

The School District suspended IP.  (*Id.* ¶ 134.)  However, Kyler never returned to school.  (*Id.* ¶ 135.)  Carmel attempted to provide Kyler with schoolwork to complete while at home, but Mrs. Nipper would not accept it, and Mr. and Mrs. Nipper withdrew Kyler from the School District on November 7, 2016.  (*Id.* ¶¶ 136–39.)

## III.  ANALYSIS

### A.   Whether Kyler Continues to Assert an Equal Protection Claim

There is no question that Kyler is bringing claims for racial discrimination in violation of Title VI, disability discrimination in violation of the Rehabilitation Act, and disability discrimination in violation of Title II of the ADA.  The School District's motion seeks summary judgment on each of these claims—but only these claims.  (*See* ECF No. 107 at 17–39.)  Kyler, in his response brief, argues that he has "asserted four claims," and further asserts that the School District has "waived the right to move for summary judgment" on his claim "pursuant to Section 1983 and the Fourteenth Amendment Equal Protection Clause."  (ECF No. 120 at 25.)  In reply, the School

District says that Kyler currently has no Equal Protection claim.  (ECF No. 133 at 2–3.)

Accordingly, the Court must resolve this dispute first.

Kyler's Second Amended Complaint asserted an Equal Protection claim against

the School District under the doctrine first announced in *Monell v. Department of Social*

*Services*, 436 U.S. 658 (1978).  (ECF No. 36 ¶¶ 95–111.)  *Monell* held that a municipal

entity can be liable for damages under 42 U.S.C. § 1983 if the entity's "policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the [constitutional] injury."  436 U.S. at 694.  The School

District moved to dismiss this claim.  (ECF No. 39 at 10–12.)  The Court granted that

motion because Kyler had alleged *Monell* liability in a purely conclusory fashion.  (ECF

No. 61 at 18–19.)  The Court dismissed the claim without prejudice.  (*Id.* at 19, 22.)

Also, for reasons not relevant to recount, the Court dismissed Kyler's Rehabilitation Act

in Title II claims without prejudice.  (*Id.* at 19–20, 22.)

About three months later, Kyler moved to amend his complaint.  (ECF No. 74.)

"The purpose of this Motion and Plaintiff's Amended Complaint," he said,

> is to reinstate his Third Claim for Relief for violations of
> Section 504 of the Rehabilitation Act of 1973 29 U.S.C.
> §§ 794 *et seq.* and the Fourth Claim for Relief for violations
> of Title II of the Americans with Disabilities Act 42 U.S.C.
> §§ 12131 *et seq.*  This Motion clears any deficiencies in the
> Second Amended Complaint that caused these claims to be
> dismissed by including additional facts, which should support
> these claims.

(*Id.* ¶ 3.)  The motion then went on to summarize allegations included in the proposed

amended complaint in support of the Rehabilitation Act and Title II claims, as compared

to the elements of those claims.  (*Id.* ¶¶ 4–17.)  More importantly, the allegations

themselves (as opposed to his summary of them) relate exclusively to disability-related

bullying.  (ECF No. 74-1 ¶¶ 27–30.)  However, the proposed amended complaint otherwise reproduced the Second Amended Complaint verbatim, including the Equal Protection claim.  (*Id.* ¶¶ 95–111.)  The Court referred that motion to U.S. Magistrate Judge N. Reid Neureiter.  (ECF No. 75.)

The School District's response brief argued that the proposed amendment was untimely and that amendment would otherwise be futile because Kyler had not alleged facts that would satisfy the elements of a Rehabilitation Act or Title II claim.  (*See* ECF No. 77.)  The School District did not mention the Equal Protection claim.  Kyler's reply brief addressed the School District's arguments, also without mentioning the Equal Protection claim.  (*See* ECF No. 82.)

Judge Neureiter eventually granted the motion and accepted the proposed amended complaint—now the Third Amended Complaint (ECF No. 74-2)—as filed. (*See* ECF No. 83.)  Apparently no one recognized that the Fourteenth Amendment claim was thereby at least nominally re-inserted into this case.  Indeed, this non-recognition continued all the way to the Final Pretrial Order, entered on November 5, 2019 (about three weeks after Kyler filed his summary judgment response brief).  There, in the summary of Kyler's claims and defenses, it states that he brings

> three claims: (1) Race-based discrimination pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, (2) Disability-based discrimination pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, and (3) Disability-based discrimination pursuant to Title II of the ADA, 42 U.S.C. § 12131 *et seq.*

(ECF No. 130 at 4.)

In this light, it is clear that Kyler never intended to reassert his Equal Protection claim, and even if he had, it would be subject to dismissal because the Equal Protection

claim in the Third Amended Complaint repeats the Second Amended Complaint verbatim, and the Court already found that the claim as pleaded in the Second Amended Complaint was deficient. In any event, the Final Pretrial Order now "controls the course of the action." Fed. R. Civ. P. 16(d). If Kyler had an Equal Protection Claim in the Third Amended Complaint, he has since abandoned it.

For all these reasons, the Court finds that Kyler no longer has an Equal Protection claim, so the Court need not consider it further.

**B.    Title VI**

Title VI prohibits racial discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The discrimination in question must be intentional. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

In a case such as this one involving student-on-student harassment, Kyler may prevail (including on the intentionality element) by showing that the School District "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) [racially motivated] harassment that was so severe, pervasive and objectively offensive that it (4) deprived [him] of access to the educational benefits or opportunities provided by the school." *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Okla.*, 334 F.3d 928, 934 (10th Cir. 2003) (internal quotation marks omitted; emphasis removed).

Deliberate indifference in this context can also be phrased as an "intentional choice to sit by and do nothing." *Id.* at 933. Thus, even where school employees "did not necessarily create the [racially] hostile environment," a school district may still be liable if its employees "facilitated" the hostile environment or "permitted it to continue." *Id.* On the other hand, a district may avoid a finding of deliberate indifference if it "respond[s] to known [student-on-student] harassment in a manner that is not clearly

unreasonable." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999).[8] "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.*

The School District argues that Kyler does not have evidence to satisfy any of the elements of his Title VI claim. (ECF No. 107 at 22–39.) Under the circumstances, the Court finds it most helpful to discuss the elements in the following order: severity and deprivation of benefit (elements 3 and 4), actual knowledge (element 1), and finally deliberate indifference and reasonable response (element 2).

    1.    <u>Sufficiently Severe Harassment</u>

The School District contends that, whatever happened to Kyler, there is no evidence that it was sufficiently severe to deprive him of access to his education. (ECF No. 107 at 24–26, 32–34.)

        a.    *Severity & Pervasiveness*

Concerning severity, the School District first describes *Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012), in which a jury found a school District liable under Title VI based on racial harassment of a Latino student that included insults (*e.g.*, "go back where you came from"), racial slurs, threats, punches to the stomach, and "[m]any other such incidents." (ECF No. 107 at 25.) The School District then argues that Kyler's case fails on the severity element because the harassment he experienced was not as severe as in *Zeno*:

---

[8] *Davis* was discussing sex-based discrimination under Title IX. The Tenth Circuit in *Bryant* explicitly equated the Title IX and Title VI claims and directed lower courts to draw upon *Davis* when evaluating Title VI claims. *See* 334 F.3d at 934.

> Unlike the classmates in *Zeno*, who preceded their physical attacks with extremely offensive racial slurs, [Kyler's] classmates called him relatively benign names under their breath, then continued moving down the hallway.  They would occasionally bump into him, but these incidents were independent of any racial remarks.  GZ allegedly called [Kyler] "cracker," "chicken nugget," and "white," and "swiss cheese," but these remarks were not accompanied by threats or with violence.  Unlike the racially charged comments in *Zeno*, the statements made by GZ did not rise to the same level of objective offensiveness, and indeed, [Kyler] admitted that he did not know what "swiss cheese" meant.  [Kyler] heard students speak to him in Spanish, which he might somehow attempt to characterize as racial behavior, but he admitted that he did not know what the words meant, so he cannot attribute them to race . . . . Therefore, *Zeno* is distinguishable and [Kyler] did not suffer severe and pervasive [racial] harassment.

(ECF No. 107 at 25–26 (citations and internal quotation marks omitted).)

The School District cannot expect to win summary judgment by picking out a case with (in the School District's view) more severe harassment, and then distinguishing it.  *Zeno* sets no standard or threshold.  It is simply another case.

In any event, even if the racial insults were "relatively benign" (as the School District puts it), a reasonable jury could still conclude that the entirety of the harassment Kyler experienced was sufficiently severe and pervasive.  First, a reasonable jury could conclude that Kyler was being harassed by Hispanic children based on his race (even if Kyler did not always understand the racial character of a particular insult).  Second, a reasonable jury could conclude that this bullying was relatively constant—or in other words, that it was not just the set of discrete events noted in school records.  And if a reasonable jury came to those conclusions, it could likewise conclude that the type of bullying multiplied by the length of time it continued established a sufficiently severe and pervasive racially hostile environment.

The Court recognizes the School District's argument that Kyler's and his parents' testimony about the constancy of the bullying "are conclusory statements with no support despite extensive discovery." (ECF No. 133 at 11, ¶ 155.) What the School District is really saying, however, is that Kyler and his parents are relying mostly on memory, and their memories are only thinly supported by the School District's own record of their complaints. But the question of how often Kyler was bullied is different from the question (addressed below) of how often the School District learned about the bullying. Moreover, reliance on memory is not "conclusory." It may be relatively weak evidence, but, in this case, it is not so weak that a reasonable jury could never credit it.

Accordingly, the Court finds that Kyler has enough evidence to raise a genuine issue of material fact as to the severity and pervasiveness of race-based bullying.

b.    *Deprivation of Educational Benefits*

As for whether the effect of the allegedly severe and pervasive race-based bullying was to deny Kyler of the benefits of his education, the School District first asserts that "[s]uch a denial may be evidenced by dropping grades or increased absenteeism." (ECF No. 107 at 32 (citing *Davis*, 526 U.S. at 634; *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003)).) The School District then attempts to show that Kyler's grades and absenteeism remained relatively constant throughout his schooling in Texas, at Pikes Peak, and at Carmel. (*Id.* at 32–33.)

The precise details of Kyler's attendance history and grades are unnecessary to relate because the School District's argument rests on an unacceptable premise, namely, that Kyler should be unable to recover because he was, in effect, already being denied the benefits of his education through other circumstances, including his own

behavior.  The Court is aware of no authority supporting this notion.  Title VI claims are not limited to good students with diligent attendance.

A reasonable jury could take into account the fact that, *e.g.*, some of Kyler's absences, or some of his poor grades, may not have been due to bullying.  Even so, grades and attendance are among the facts to consider—they are not the beginning and end of the analysis.  Even if Kyler had been absent from school for various non-bullying reasons before he attended Pikes Peak or Carmel, a reasonable jury could nonetheless credit his and his parents' testimony that his absences from *those* schools were often due to fear of bullying.

For these reasons, the School District has failed to establish that Kyler has no evidence from which a reasonable jury could find in his favor on this element.

### 2.     Actual Knowledge of Harassment Motivated by Race

The School District asserts it did not have actual knowledge of the racial harassment Kyler was experiencing.  (ECF No. 107 at 27–32.)  In this regard, the School District mostly argues that the various instances of bullying that made it into School District records can be seen as ambiguous about whether the bullying was race-motivated.  Ambiguous or not, Mr. and Mrs. Nipper are prepared to testify that they contacted the School District dozens of times to complain about race-based harassment against Kyler, at times speaking directly with the principals of Pikes Peak and Carmel.[9]

---

[9] In *Murrell v. School District No. 1*, 186 F.3d 1238 (10th Cir. 1999), the Tenth Circuit held in a Title IX sexual harassment case that liability can be imputed to a school district if "a school official who possessed the requisite control over the situation had actual knowledge of, and was deliberately indifferent to, the alleged harassment."  *Id.* at 1247.  Kyler cites *Murrell* for the proposition that when "the principal [has] actual knowledge" of the harassment on the basis of a protected characteristic, the School District has knowledge.  (ECF No. 120 at 29.)  The School District does not challenge Kyler's application of *Murrell* to this case.  In addition, the

The School District denigrates this testimony as "self-serving."  (ECF No. 133 at 9, 12.)  Like its "conclusory" attack above, what the School District is really saying is that this testimony should not be believed because it is supposedly unsupported by anything beyond Mr. and Mrs. Nipper's own say-so.  That is an argument for trial, not summary judgment.

The Court recognizes the implicit concern that, in cases like this, memories can be vague, and the emotions undoubtedly stirred by being asked to recall the events may lead to exaggeration—easy to say, and often hard to disprove.  The question for this Court, however, is whether a reasonable jury could find in Kyler's favor that the School District had actual knowledge of racial harassment.  Looking at all the evidence together, the Court finds that even if the jury concluded that Mr. and Mrs. Nipper's testimony was exaggerated, it could still reasonably conclude that the School District had actual notice—even if not the amount of notice that Mr. and Mrs. Nipper claim.

Accordingly, the School District has failed to show a lack of evidence on this element.

3.    Deliberate Indifference vs. Reasonable Response

Here, the question of deliberate indifference versus a reasonable response fits a recurring template for these kinds of school bullying/harassment cases.  From the school's perspective, it is a set of discrete incidents that the school became aware of and handled (in its view) according to proper procedures.  (*See* ECF No. 107 at 35–36,

_____

School District nowhere argues that Kyler may not combine the collective knowledge of two school administrations (Pikes Peak and Carmel) which—as far as the record reveals—never spoke with each other about Kyler before the stabbing incident, and impute that collective knowledge to the School District for purposes of the claims Kyler asserts in this lawsuit.  The Court therefore need not address these matters.

38.)  From the student's perspective, it is a sustained pattern of harassing or bullying

behavior that pervades the student's school experience, showing that the school's

incident-by-incident approach was inadequate and ultimately unreasonable.  (*See* ECF

No. 120 at 20–21.)  *Cf. Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d

952, 965–68 (D. Kan. 2005) (describing similar competing views of the evidence in a

Title IX sexual harassment case).

Having reviewed the record carefully, the Court finds that a reasonable jury could

accept Kyler's view of the evidence, *i.e.*, that his parents made frequent complaints

about racially-motivated bullying, and the School District's incident-by-incident approach

eventually became unreasonable, and deliberately indifferent, as the bullying continued.

Kyler therefore has raised a genuine issue of material fact on the deliberate indifference

element, so summary judgment in the School District's favor is inappropriate on Kyler's

Title VI claim.

## C.     Rehabilitation Act & ADA Title II Claims

The School District also attacks his Rehabilitation Act and ADA claims, but on

more limited grounds.  (ECF No. 107 at 17–21.)

The Rehabilitation Act states that "[n]o otherwise qualified individual with a

disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance."

29 U.S.C. § 794(a).[10]  Similarly, Title II states that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be

_____

[10] There is no dispute that the School District receives federal funding.

denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C. § 12132.

        1.   <u>Presence of a Disability</u>

In most contexts, including this one, Rehabilitation Act § 504 adopts the ADA's

definition of "individual with a disability."  *See* 29 U.S.C. § 794(a) (cross-referencing

29 U.S.C. § 705(20)); *id.* § 705(20)(B) (in turn cross-referencing 42 U.S.C. § 12102).

According to the ADA,

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).

The School District's motion contains factual allegations (about, *e.g.*, riding bikes,

playing football, etc.) that one could interpret as casting doubt on whether Kyler's toe-

walking was a disability at the relevant time, but the motion contains no argument that

the School District deserves summary judgment because Kyler cannot satisfy the

disability element.  (*See* ECF No. 107 at 17–39.)  Kyler accordingly argues in his

response brief that the School District has "waived that argument."  (ECF No. 120

at 26.)  The School District's reply brief counters that its statement of facts was enough

to preserve the argument, and then explicitly attacks the disability element.  (ECF

No. 133 at 18.)

The Court need not resolve either argument—whether Kyler's toe-walking was a

disability, or whether the School District forfeited its opportunity to challenge that

element at summary judgment.  The Court may presume that Kyler was disabled for purposes of his ADA and Rehabilitation Act § 504 claims because the outcome of those claims turns on whether the School District had knowledge of the disability at the relevant time.

       2.   <u>Knowledge of Disability</u>

To hold the School District liable under the relevant statutes, Kyler must prove that the School District had "knowledge that [he was] disabled, either because that disability [was] obvious or because [he] (or someone else) . . . informed the [School District] of the disability."  *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007).  In this light, the School District argues that it "could not have discriminated against [Kyler] 'by reason' of his disability, because it had no indication that [Kyler] was disabled."  (ECF No. 107 at 18.)  The School District particularly points out that

- Mrs. Nipper filled out paperwork on multiple occasions denying that Kyler had any medical conditions, including medical conditions that would prevent him from participating in sports;

- a physician certified him as capable of participating in athletics without limitation;

- he played football in gym class;

- Kyler walked and rode his bike to school;

- until around the time Kyler started sixth grade at Carmel, Mr. and Mrs. Nipper thought that Kyler's toe-walking was a habit that he needed to break, not a disability; and

- Kyler did not have a § 504 plan until September 28, 2016, eight days before IP stabbed him—an attack Kyler claims to have been racially motivated, not motivated by disability.

(ECF No. 107 at 18–19; ECF No. 133 at 6–7, 19.)

Kyler responds that

- one could not help but notice that he always walked on his toes;

- he was indisputably teased about his walking style by other students "who said that his feet were 'funny shapes,' and [who] made fun of the way he walked and made fun of his shoes for being worn down and trashy" (quoting ECF No. 107 at 7, ¶ 48);

- Mr. Nipper met with Principal Donaldson (at Pikes Peak) and told her that Kyler was being bullied for the way he walked;

- Mr. Nipper met with Principal Breske (at Carmel) and told her that Kyler was being bullied for the way he walked *and* he was being treated for the condition that caused him to walk that way; and

- Principal Breske reportedly responded that she had seen Kyler being harassed for the way he walked.

(ECF No. 120 at 27–30.)  Thus, Kyler argues that the School District was aware of his disability because it was obvious, and the School District had been told about it anyway.

In the Court's view, no reasonable jury could find that the School District was aware of Kyler's disability prior to mid-September 2016.  Kyler of course has evidence that the School District knew Kyler tended to walk on his toes, but there is no evidence that anyone understood this to be an *impairment*, as opposed to a quirky habit, before

Mr. Nipper allegedly told Principal Breske in mid-September 2016 that he and

Mrs. Nipper were exploring treatment for the anatomical condition that caused Kyler to

walk as he did.[11]  Moreover, no reasonable jury could find that the disability-related

bullying Kyler allegedly experienced between the time the School District, via Principal

Breske, became aware of his impairment *qua* impairment (mid-September 2016) and

his last day of school (October 7, 2016) was sufficiently severe and pervasive to impose

a duty on the School District to intervene.  To the contrary, the evidence about that

relatively short time period overwhelmingly focuses on racially-motivated discrimination.

(*See* Parts II.B.3–10, above.)  Finally, no reasonable jury could find that the School

District had enough time to formulate and implement a reasonable response to

disability-related bullying between mid-September 2016 and October 7, 2016.

For all these reasons, the School District is entitled to summary judgment on

Kyler's Rehabilitation Act and ADA claims.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  The School District's Motion for Summary Judgment (ECF No. 107) is GRANTED

with respect to Kyler's claims that the School District violated the Rehabilitation

Act and Title II of the ADA, but DENIED with respect to Kyler's claim that the

School District violated Title VI; and

---

[11] To be clear, this is antecedent to the question of whether the School District "regarded" Kyler as disabled.  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  Under this definition, the School District could not have regarded Kyler as disabled without first coming to know (or at least believe) that he had an impairment.

2.      As to Kyler's Title VI claim, this matter REMAINS SET for a Final Trial

Preparation Conference on October 9, 2020, at 1:30 PM, and a seven-day jury

trial beginning on October 26, 2020, at 8:30 AM, both in Courtroom A801.

Dated this 15th day of April, 2020.

BY THE COURT:

William J. Martínez
United States District Judge